UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

| | |
|---|---|
| SANDRA JOSEPH, WENDY JOSEPH MOORE, MONICA ATKINS, MIGUEL MEYER, ALISE LAUREEN BOULE-LION, DARIC LION, and SCOTT HUNT, | Case No.: |
| Plaintiffs, | **COMPLAINT** |
| -against- | **JURY TRIAL DEMANDED** |
| FREE STATE OF BAVARIA and BAVARIAN STATE PAINTING COLLECTIONS, | |
| Defendants. | |

----------------------------------------------------------------X

Plaintiffs SANDRA JOSEPH, WENDY JOSEPH MOORE, MONICA ATKINS, MIGUEL MEYER, ALISE LAUREEN BOULE-LION, DARIC LION, and SCOTT HUNT (Collectively "Plaintiffs"), through their attorneys, as and for their Complaint against Defendants Free State of Bavaria and the Bavarian State Painting Collections (collectively, "Defendants"), alleges as follows:

## PRELIMINARY STATEMENT

1.      This action is brought under the Holocaust Expropriated Art Recovery (HEAR) Act to remedy a double injustice: the first, a theft perpetrated by the Nazi regime, and the second, a cover-up perpetuated for decades by the Defendants, the Free State of Bavaria and its State Painting Collections ("BStGS"). This lawsuit seeks the restitution of the magnificent painting "Young Girl with Straw Hat" (the "Painting") by Friedrich von Amerling, which was wrongfully taken in 1935 from the renowned Jewish art dealers Louis, Hans, and Fritz Lion (the "Lion brothers") as a direct result of Nazi persecution. (Ex. A, "Young Girl with Straw Hat")[1]

---

[1] https://www.sammlung.pinakothek.de/de/artwork/k2xnYgN4Pd, last accessed November 10, 2025.



2.      The Lion brothers were highly respected art dealers who ran one of Munich's premier galleries. But as Jews in Nazi Germany, their lives and business were systematically destroyed. In 1935, under extreme financial duress and facing imminent professional ruin orchestrated by the Nazis, they were forced to transfer the Painting to the BStGS in a sham "exchange."

3.      Defendants' own Nazi-era director celebrated the transaction internally, boasting that the museum received an "excellent" painting in "exchange" for what he himself described as "richly banal" and "kitschy" works—art the Lion family's heirs contend was *never even received*.

4.      As will be demonstrated below, there was never any "exchange," with the BStGS, as the Lion brothers never received any paintings in return.

5.      Additionally, even if there was an "exchange," which there was not, any exchange by persecuted Jews and a Nazi-run museum would have been clearly made under duress.

6.      The initial theft of the painting, however, was compounded by Defendants' modern-day bad faith. For decades, in stark violation of Germany's commitments under the Washington Principles, Defendants have concealed the Painting's tainted history. As revealed in the "looted art scandal" of February 2025, Defendants' own internal database, known as "MuseumPlus," has long classified the Painting as definitive Nazi-looted art (internally marked "*Prov. Ampel rot*[2]").

7.      In fact, the internal database for Inventory Nr. 9999 from the defendant shows that the painting was internally classified as "Red Light" as early as **2019**.

8.      Indeed, as far back as 2014 the defendants were aware that the painting was looted holocaust art, and had belonged to a persecuted Jewish family and a persecuted Jewish gallery. (Ex. B, MusemPlus Record).

9.      Yet, when the family's legal counsel inquired in 2024, Defendants lied, claiming they were only just beginning "in-depth research." This pattern of delay and deception is designed to allow Defendants to retain priceless works of art stolen from Holocaust victims.

10.     By knowingly possessing and concealing the status of the looted Painting, Defendants have perpetuated the injuries inflicted by the Nazi regime, forcing the heirs of the Lion brothers to expend *enormous resources* to reclaim what is rightfully theirs. This action seeks to finally right this historic and continuing wrong and hold Defendants accountable for their role in both the original expropriation and the subsequent decades-long cover-up.

---

[2] *Prov. Ampel rot* Translates to "Traffic light Red" or "Red Light"

## JURISDICTION AND VENUE

11.     Jurisdiction over the Defendants is further proper under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(3), because this action concerns rights in property taken in violation of international law.

**The Taking Was Not A Domestic Taking, But Was a Violation of International Law.**

12.     At the time of expropriation, the Lions were Austrian nationals residing in Germany under temporary residence permits.

13.     The *Amerling* taking occurred in 1935, well before the 1938 Anschluss, when Austria was annexed by Germany. At the time of expropriation, the Lions remained *Austrian nationals* residing in Germany under temporary residence permits.

14.     Because the Free State of Bavaria confiscated the property of foreign citizens, the seizure was not a domestic act but a taking in violation of international law.

**The Taking Was Done By A State Actor, Nazi Party Member Ernst Buchner.**

15.     Museum Director Ernst Buchner, a Nazi party member, was the state actor who was responsible for the taking of the painting.

16.     Director Buchner acted on behalf of, or at the direction of, the German government when he took possession of the Amerling painting.

17.     The taking was done in Director Bucher's capacity as a card-carrying member of the Nazi party.

18.     The Amerling painting was extorted from the Lion brothers in 1935 as a direct result of Nazi persecution. The Defendants continue to retain and exploit this artwork while engaging in commercial activity in the United States, including the loan and exhibition of artworks, participation in art-market transactions, and cooperative agreements with U.S. cultural institutions.

These activities bring the Defendants squarely within both the expropriation exception, 28 U.S.C. § 1605(a)(3), and the commercial activity exception, 28 U.S.C. § 1605(a)(2).

19.    This action is also timely under the Holocaust Expropriated Art Recovery (HEAR) Act, Pub. L. 114-308 (2016). The statute of limitations did not begin to run until 2024, when the heirs first discovered through Defendants' own admissions and records that the painting had long been internally classified as Nazi-looted art. Any earlier constructive notice is negated by Defendants' decades-long concealment and misrepresentations, which toll the limitations period and bar Defendants from asserting laches or repose.

20.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and the Holocaust Expropriated Art Recovery (HEAR) Act of 2016, Pub. L. No. 114-308, as this is a civil action to recover artwork that was taken as a result of Nazi persecution. Jurisdiction over the foreign state Defendants is proper under exceptions to the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1603, et seq., including the expropriation exception set forth in 28 U.S.C. § 1605(a)(3), as this case concerns rights in property taken in violation of international law, and the commercial activity exception under 28 U.S.C. § 1605(a)(2). This Court has supplemental jurisdiction over Plaintiff's related state-law claims pursuant to 28 U.S.C. § 1367(a).

21.    Venue is proper in this Court under 28 U.S.C. § 1391(f)(1)–(4), because Defendants are foreign states subject to suit under the FSIA, and because the Defendants engage in substantial commercial activity in New York, including loans of artworks for exhibition and related agreements with institutions in this District. Defendants' wrongful retention of Nazi-looted art continues to cause injury to Plaintiffs, making venue appropriate in the Southern District of New York.

## PARTIES

22.    Plaintiff SANDRA JOSEPH is a United States citizen residing in North Carolina. She is the granddaughter of Louis Lion and heir to the Lion brothers' estate, having inherited her interest through her mother Therese Joseph (née Lion).

23.    Plaintiff WENDY JOSEPH MOORE is a United States citizen residing in North Carolina. She is the granddaughter of Louis Lion and an heir to the Lion brothers' estate, having inherited her interest through her mother Therese Joseph (née Lion).

24.    Plaintiff MONICA ATKINS is a United States citizen residing in Michigan. She is the granddaughter of Louis Lion and an heir to the Lion brothers' estate, having inherited her interest through her mother Mignon Meyer (née Lion).

25.    Plaintiff MIGUEL MEYER is a citizen of Germany. He is the grandson of Louis Lion an heir to the Lion brothers' estate, having inherited her interest through his mother Mignon Meyer (née Lion).

26.    Plaintiff ALISE LAUREEN BOULE-LION is a United States citizen residing in Maryland. She is the granddaughter to Fritz Lion and an heir to the Lion brothers' estate, having inherited her interest through her father Giudo Lion.

27.    Plaintiff DARIC LION is a citizen of Switzerland. He is the grandson of Fritz Lion and an heir to the Lion brothers' estate, having inherited her interest through his father Giudo Lion.

28.    Plaintiff SCOTT HUNT is a United States citizen residing in Arizona.  He is heir to the Lion brothers' estate, having inherited her interest through his cousin Irene Lion, the wife of Stephan Lion, son of Louis Lion.

29.     Defendant FREE STATE OF BAVARIA is a constituent state of the Federal Republic of Germany. It is a "foreign state" as that term is defined in the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1603(a).

30.     Defendant BAVARIAN STATE PAINTING COLLECTIONS ("BStGS" or "Bayerische Staatsgemäldesammlungen") is a museum organization and an agency or instrumentality of the Free State of Bavaria, headquartered in Munich, Germany. The BStGS has possession, custody, and control over the "Young Girl with Straw Hat" painting at issue in this action. As an agency or instrumentality of a foreign state, the BStGS is also defined as a "foreign state" under the FSIA, 28 U.S.C. § 1603(a).

31.     Defendants engage in substantial commercial activities having direct effects in the United States, including: (a) operating public museums that generate revenue through admission fees; (b) publishing and selling exhibition catalogs internationally that are marketed to and purchased by U.S. consumers; (c) licensing artwork reproductions globally, including to U.S. entities; (d) conducting traveling exhibitions that have toured U.S. venues; (e) maintaining commercial websites targeting American audiences for cultural tourism; (f) participating in art loans and exchanges with U.S. cultural institutions; and (g) marketing museum services and products to U.S. visitors and researchers.

32.     Defendants operate commercial websites accessible to and targeting U.S. users, generating revenue through online catalog sales, digital licensing, and marketing cultural tourism services specifically to American visitors. These activities constitute commercial conduct directed at and having substantial effects within the United States.

33.     Defendants continue to commercially exploit the Painting through public exhibition, catalog reproduction, digital licensing, and related revenue-generating activities. These commercial activities directly benefit from and perpetuate the 1935 wrongful taking, creating a

7

substantial connection between the taking and Defendants' ongoing commercial activities affecting U.S. commerce.

34.    Upon information and belief, at all relevant times, Defendants acted in concert with respect to the wrongful retention of the Painting and are jointly and severally liable for the claims asserted herein.

## FACTUAL ALLEGATIONS

35.    This case concerns the wrongful possession by Defendants of the masterpiece "Young Girl with Straw Hat," (the "Painting"), painted by Friedrich von Amerling in or around 1835. The Painting was the property of the renowned Jewish art dealers, brothers Louis, Hans, and Fritz Lion, until it was extorted from them in January 1935 as a direct result of Nazi persecution.

36.    Internal records of the Bavarian State Painting Collections ("BStGS") confirm that the Amerling painting was categorized as definitive Nazi-looted art. Indeed, by 2014 the defendants were aware that the Lion brothers were persecuted as Jews in Nazi Germany.

37.    However, the defendant only published the painting in dispute in *March 2025,* after the scandal arose that the defendant undertook provenance research, but in cases like this never shared their findings about their Holocaust Looted Art with the public and never searched for the heirs like the plaintiffs. As such, the defendants hid the looted art for *decades*.

38.    In July 2021, BStGS's provenance head, Dr. Andrea Bambi, reported to senior leadership that the painting was one of approximately 200 works marked "Prov. Traffic light Red" in the internal MuseumPlus database, a designation reserved for works identified as looted art. Despite this, when counsel for the heirs inquired in 2024, Defendants falsely claimed that provenance research had only just begun, concealing their own prior findings.

39.    Moreover, the Amerling painting was itself registered by Defendants in the official Lost Art database under ID No. 626780, acknowledging it as "cultural property confiscated as a

result of Nazi persecution." Yet, even after this registration, Defendants publicly denied that the loss was persecution-related, contradicting their own official filings.

40.     The Defendants' misconduct is part of a broader pattern. A leaked list revealed that BStGS internally classified roughly 200 works as looted ("red") and over 800 as suspected looted ("orange"), but restituted only 24 works in decades.

41.     Instead of proactively returning works to heirs, the Defendants engaged in systemic concealment and delay, prompting international condemnation and the dismissal of their director general in 2025.

42.     Defendants' concealment caused the heirs to expend significant resources and delayed their ability to pursue recovery until recent disclosures in 2024–2025. Under the HEAR Act, the limitations period begins at actual discovery of such facts, making this suit timely.

**The Lion Brothers and Their Prominent Art Business**

43.     The claimants are the heirs of the three Jewish brothers Louis Lion (b. 1884), Hans Lion (b. 1885), and Fritz Lion (b. 1886). The brothers were Austrian citizens of the Jewish faith.

44.     In May 1922, the Lion brothers established the "Kunsthandlung Brüder Lion," an art and antiquities dealership at the prestigious address of Maximiliansplatz 14 in Munich. (Ex. C).



45.    The gallery comprised 11 exhibition rooms on two floors. Louis was the main owner with a one-half share, while his brothers each owned one-quarter.

46.    The Kunsthandlung Brüder Lion was a highly respected and successful enterprise, developing an international reputation. Its clientele included prominent museums and prestigious private collectors such as J.P. Morgan, Her Majesty the Queen of Romania, and Count Lonyay.

47.    The brothers' success extended beyond Munich. From 1928 to 1933, they operated a branch in Berlin's Hotel Esplanade, and they also ran a seasonal gallery in Marienbad, continuing a family art dealing tradition that spanned over 50 years.

**The Rise of the Nazi Party and Persecution of the Lion Family**

48.    The Lion brothers' thriving business and personal lives were devastated following the rise of the National Socialist party in Germany in 1933. As Jews, they were collectively and individually targeted by the Nazi regime's systematic campaign of persecution.

49.    In 1933, the brothers were forced to close their Berlin branch due to Nazi boycotts and anti-Semitic pressure.

50.    The persecution directly impacted their financial stability. The Munich art dealership, once highly profitable, recorded a significant loss of 4,907 Reichsmarks in 1934. The brothers were unable to pay themselves salaries, plunging their families into a state of severe financial distress.

51.    The Nazi regime's campaign to oust Jews from economic life culminated in a direct order targeting the Lion brothers' business. On August 30, 1935, the Reich Chamber of Fine Arts (Reichskammer der Bildenden Künste) ordered the Lion brothers, along with 40 other Jewish art dealers in Munich, to liquidate their business within four weeks, officially deeming them "untrustworthy" to participate in German cultural life.

10

52.     In a desperate plea to the Chamber of Industry and Commerce on September 2, 1935, Louis Lion explained the family's dire situation, stating that a forced liquidation was "an impossibility" and that "as we do not have any cash assets, we would have no means of existence." (Ex. D, Letter from Louis Lion, dated September 2, 1935)

53.     The content of the letter reflects the hopeless and threatening plight in which the brothers had found themselves since the Nazis came to power. On July 10, 1935, the Lion brothers were forced to deregister the Munich art dealership in writing, according to a note from the Munich Chamber of Industry and Commerce dated July 13, 1937. A successor was not appointed.

54.     In the year 1935, the year in which the Amerling painting "Young Girl with a Straw Hat" was taken by the defendant, the art dealership's losses already totaled 10,605 Reichsmarks.

55.     The financial plight of the art dealership had devastating consequences for the families of Louis, Hans and Fred Lion. As they had been unable to pay themselves salaries since 1934 due to a lack of profits, they found themselves in a hopeless financial predicament.

56.     Louis Lion declared to the Reich Chamber of Fine Arts in autumn 1935 that although the art dealership had a large stock overall, he and his brothers no longer had any cash assets to support themselves and their families. As Louis Lion's statement clearly shows, the brothers were financially ruined.

**The Fraudulent "Exchange" of the Amerling Painting**

57.     It was in this atmosphere of extreme persecution and financial desperation that Defendants' predecessor, the BStGS, "acquired" the Painting. On or about January 18, 1935, the Lion brothers were coerced into transferring the Painting (Inv. Nr. 9999) to the BStGS.

58.     Defendants have characterized this transaction as a legitimate "exchange," claiming the Lion brothers received two paintings from the museum's collection in return: "Gartenszene" by Luigi Nono (Inv. Nr. 7760) and "Stilleben" by Max Schödl (Inv. Nr. 8059).

59.    This is simply not true. First, there is no record, aside from fraudulent Nazi records, of the transaction. Indeed, the paintings do not appear in any subsequent family or business inventories, and their current whereabouts are unknown to the heirs.

60.    Second, there is no "tausch" or "contract of exchange." In Germany, for any barter or exchange regarding art, it is commonplace, and was commonplace in 1935, to have the exchange memorialized in a "tausch" contract. No such document exists because there was no exchange.

61.    Third, the Lion brothers were ordered to *liquidate* their art collections. Why then would the Nazi Government give them *more art*?

62.    Further, the words of Louis Lion himself speak volumes, in his September 2, 1935 letter, he made it clear that a "liquidation of our very large stock in the requested period [...] was an impossibility." (Ex. D),

63.    When assessing the exchange transaction with the Bavarian State Painting Collections in January 1935, it is important to emphasize Louis Lion's description of the financial emergency in his letter to the Chamber.  "Also, as we do not have any cash assets, we would have no means of existence." (Id.).

64.    As such, no exchange could never have taken place.

65.    In reality, the "acquisition" of this painting was nothing more than outright theft. There never was an exchange, as the Lion Brothers *never took possession* of the "Gartenszene" by Luigi Nono (Inv. Nr. 7760) and "Stilleben" by Max Schödl (Inv. Nr. 8059).

**Museum Director and Nazi Party Member Ernst Buchner**

66.    Museum Director Ernst Buchner was not a private opportunist but a state official and Nazi Party member exercising sovereign governmental authority when he executed the forced exchange. Buchner's internal correspondence celebrating the unconscionable transaction—

12

acknowledging the state received an "excellent" painting while giving away "waste and trash"—constitutes admissions by a government official acting under color of state law.

67.    In a letter dated January 15, 1935, (Ex. E, Letter from Buchner), Director General Buchner confirmed and emphasized the absolute inferiority of the allegedly exchanged paintings, which clearly speaks against a voluntary exchange:

> *"In the following, I propose the acquisition of two paintings that are important and desirable for our collections, which can be realised by handing over artistically indifferent depot paintings that are unsuitable for museum display.*
>
> *1) Portrait of a Girl with a Straw Hat by Friedrich von Amerling (1803-1887), the famous master of 19th century Viennese portrait painting, from the Lion art dealership (Munich). Amerling is not yet represented in our collection. This charming, highly sympathetic portrait is an excellent representation of Amerling's art.  Instead, it would have to be sold - as quite dispensable: A rather banal genre painting (garden scene) by the Italian master Luigi Nono (...) and a small, kitschy-smooth still life by the Viennese painter Max Schödl."*

68.    The taking occurred within the broader framework of systematic state persecution orchestrated by Nazi governmental policy. The Reich Chamber of Fine Arts order forcing liquidation of Jewish art dealers was direct governmental action that created the coercive environment enabling the state museum's exploitation of the Lion brothers' desperation.

**The Coerced "Exchange" Would Have Been Made Under Duress**

69.    Even if the "exchange" did take place, which it did not, the exchange itself would be void as it was clearly made under duress.

70.    By January 1935, when the alleged "exchange" occurred, the Lion Brothers faced catastrophic financial ruin directly attributable to Nazi persecution. The Munich art dealership, once highly profitable, recorded devastating losses of 4,907 Reichsmarks in 1934 with zero profits.

13

71.     The financial devastation escalated dramatically in 1935, the very year of the forced transfer, with losses ballooning to 10,605 Reichsmarks. The Brothers were unable to pay themselves salaries or support their families, having been financially destroyed by systematic Nazi persecution.

72.     The timing of the coerced "exchange" - occurring in the depths of the Brothers' financial crisis and just months before their forced business liquidation - demonstrates the absence of any meaningful alternative or bargaining power.

73.     The alleged exchange occurred within a comprehensive framework of state-sponsored persecution designed to eliminate Jewish participation in German economic life. In 1933, the Brothers were forced to close their profitable Berlin branch due to Nazi boycotts and systematic exclusion.

74.     Buchner's internal correspondence reveals the state's deliberate exploitation of the Lion Brothers' desperate situation. In his January 15, 1935 letter seeking ministerial approval, Buchner boasted that the museum was acquiring a "superb, excellent painting" while dispensing what he himself characterized as "artistically indifferent depot paintings" - specifically, a "richly banal genre painting" and a "small, kitschy, smooth still life".

75.     This internal admission constitutes direct evidence that Defendants, acting as state agents, knowingly exploited the Lion Brothers' persecution-induced desperation to extract an unconscionably one-sided transaction that would never have occurred under normal commercial circumstances.

**Defendants' Contemporaneous Knowledge of the Unconscionable Transaction**

76.     Defendants, through their own leadership at the time, knew the "exchange" was grossly inequitable and unconscionable.

77.     Unlike cases involving private profiteers, the 1935 taking was executed directly by Defendants as *state actors*. The Bavarian State Painting Collections, as an official state museum entity, acquired the Painting through its Director Ernst Buchner acting in his governmental capacity as a state official. This transaction was formalized through "Ministerielle Entschließung Nr. 2715" (Ministerial Resolution No. 2715), demonstrating clear governmental authorization and state sanction.

**The Destruction of the Lion Family's Livelihood and Assets**

78.     The taking of the Painting was a prelude to the complete destruction of the Lion family's livelihood and assets. The art gallery was officially liquidated and closed on December 31, 1936.

79.     In June 1937, Louis Lion and his family fled Munich. His brothers Hans and Fritz also emigrated that same year, narrowly escaping the escalating Nazi terror.

80.     On October 9, 1939, the Gestapo issued an order seizing all remaining assets of the Lion family within Germany.

81.     Subsequently, in January 1941, all their confiscated property was declared forfeited to the German Reich. The Lion family lost everything: their business, their homes, their art, their assets, and their cultural identity.

**Defendants' Post-War Concealment and Ongoing Bad Faith**

82.     For decades following the Holocaust, in flagrant disregard for their obligations under the Washington Principles of 1998, Defendants engaged in a systematic cover-up of the Painting's tainted provenance.

83.     Upon information and belief, Defendants' own internal research had long established the Painting as Nazi-looted art. A leaked internal BStGS database known as "MuseumPlus," reflecting the museum's knowledge as of at least July 2021, classifies the

Amerling Painting as "Prov. traffic light Red"—the internal designation for certain or highly probable Nazi-looted art. (Ex. B, MusemPlus Record).

84.      In fact, Defendants were aware as early as April 2014 that the paintings were Holocaust Looted Art when they checked the status of the LION brothers as persecuted in Vienna at the "*Bundeskanzleramt, Personen-Mappenverzeichnis*" under Nr. [3]. (Id.).

85.      The painting was internally classified under Inventory Number 9999 as looted art with by September 5, 2019.

86.      Despite possessing this internal knowledge for years, Defendants ***made no effort whatsoever*** to contact the Lion heirs. Worse, when the heirs' counsel in Germany, Dr. Hannes Hartung, made an inquiry on April 2, 2024, Defendants falsely claimed they were only at the "beginning of their research" into the Painting's history.

87.      This pattern of delay and deception was exposed as a "looted art scandal" in the German and international press in February 2025, revealing Defendants' bad faith and duplicity.

88.      Only after this public exposure did Defendants, on March 24, 2025, report the Painting to the German Lost Art database (Lost Art ID 626780) – ***eleven years*** after they were aware that the painting was looted holocaust art --  an act tantamount to an admission that the work was confiscated as a result of Nazi persecution.

89.      Further demonstrating their bad faith, on September 1, 2025, Defendants announced the restitution of two other, far less valuable paintings by Franz Sigrist that were also acquired from the Lion brothers. This was a cynical public relations maneuver—a "Wag the Dog" tactic—designed to create a false appearance of cooperation for art that is not valuable.

90.      In that same announcement, Defendants refused to restitute the Amerling Painting.

91.      By lying to the heirs, concealing their own internal findings, and attempting to distract from the high-value claim with the token restitution of lesser works, Defendants have

perpetuated the original Nazi-era injustice and acted in profound bad faith, forcing the heirs into litigation to recover what is rightfully theirs.

## FIRST CAUSE OF ACTION
### (Recovery of Artwork Under the Holocaust Expropriated Art Recovery (HEAR) Act of 2016)

92.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

93.     The HEAR Act of 2016 facilitates the recovery of artwork lost between January 1, 1933, and December 31, 1945, due to Nazi persecution. It provides a federal cause of action and establishes a six-year statute of limitations that commences upon a claimant's "actual discovery" of both their interest in the specific artwork and the identity and location of the artwork.

94.     Defendants are in possession of the Painting, which is "artwork" within the meaning of the HEAR Act that was taken from the Lion brothers, individuals who were persecuted by the Nazi regime on racial and religious grounds.

95.     The Painting was lost on or about January 18, 1935, as a direct result of Nazi persecution. The so-called "exchange" was an involuntary disposition forced upon the Lion brothers under extreme financial duress and the threat of professional and personal ruin orchestrated by the Nazi regime. This coerced transaction constitutes a confiscation or other taking in violation of international law.

96.     This action is timely filed under the HEAR Act. The six-year statute of limitations was tolled by Defendants' fraudulent concealment of the Painting's looted status and only began to run when Plaintiff, through her counsel, obtained actual knowledge of the facts sufficient to bring this claim, including the discovery of Defendants' internal classification of the Painting as Nazi-looted art and the bad faith nature of their possession, which occurred well within the six years preceding the filing of this Complaint.

97.    As a direct and proximate result of Defendants' wrongful taking and continued unlawful possession of the Painting, Plaintiff and the other rightful heirs of the Lion brothers have been, and continue to be, deprived of their lawful property. Plaintiff is therefore entitled to the immediate restitution and return of the Painting.

## SECOND CAUSE OF ACTION
### (Declaratory Judgment – 28 U.S.C. §§ 2201, 2202)

98.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

99.    An actual and justiciable controversy has arisen and now exists between Plaintiff and Defendants concerning their respective rights and interests in the Painting. Plaintiff contends that she and the other heirs of the Lion brothers are the sole, lawful owners of the Painting, while Defendants wrongfully claim title and right to possession based on a void and unconscionable transaction.

100.    As alleged herein, the 1935 "exchange" transaction upon which Defendants base their claim to the Painting was not a valid conveyance of title. Rather, it was an involuntary transfer exacted under duress and as a direct result of the Nazi regime's persecution of the Lion brothers, constituting a seizure in violation of international law. Therefore, the purported "exchange agreement" is, and always has been, void *ab initio*.

101.    A judicial declaration is necessary and appropriate to adjudicate the controversy, terminate the uncertainty giving rise to this proceeding, and affirm the legal status of the Painting.

102.    Accordingly, Plaintiff seeks a judgment from this Court pursuant to 28 U.S.C. §§ 2201 and 2202 declaring that:

    a. The 1935 transaction involving the Painting was the product of Nazi persecution and duress and is therefore void and of no legal effect;

b.  Plaintiff and the other heirs of Louis, Hans, and Fritz Lion are the sole and exclusive owners of the Painting; and

c.  Defendants have no valid legal right, title, or interest in the Painting.

### THIRD CAUSE OF ACTION
**(Replevin / Claim and Delivery)**

103.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

104.    Plaintiff and the other heirs of the Lion brothers are the lawful owners of the Painting and have a right to its immediate possession.

105.    The Painting is a unique and irreplaceable item of personal property.

106.    Defendants are in wrongful possession and detention of the Painting. Defendants' claim of right to possession is invalid, as it is derived from a void transaction that did not transfer rightful title from the Lion brothers.

107.    On or about April 2, 2024, and on numerous occasions thereafter, Plaintiff, through her counsel, demanded that Defendants return the Painting. Defendants have refused and continue to wrongfully detain the Painting.

108.    As a direct and proximate result of Defendants' wrongful detention of the Painting, Plaintiff and the other heirs have been deprived of their property. Plaintiff is therefore entitled to a judgment of replevin, ordering the immediate turnover and return of the Painting.

### FOURTH CAUSE OF ACTION
**(Conversion)**

109.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in the above paragraphs above with the same force and effect as if fully set forth herein.

110.    At all relevant times, Plaintiff and the other heirs of the Lion brothers have held the property interest and right to immediate possession of the Painting.

111.    Defendants have intentionally and wrongfully exercised dominion and control over the Painting in a manner that is inconsistent with and in denial of the rights of the true owners.

112.    Defendants' acts of conversion include, but are not limited to: wrongfully retaining possession of the Painting after a demand for its return was made; publicly displaying the Painting as their own property; concealing the Painting's known status as Nazi-looted art; and continuing to wrongfully assert ownership over the Painting.

113.    Defendants' exercise of dominion and control over the Painting is without justification, authorization, or consent.

114.    As a direct and proximate result of Defendants' conversion of the Painting, Plaintiff and the other heirs have been damaged. Plaintiff is entitled to the return of the Painting or, alternatively, to compensatory damages in an amount equal to the full market value of the Painting, to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Duress And Unconscionable Contract)

115.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

116.    The purported 1935 "exchange" was the product of duress, both economic and under color of state law, rendering any alleged agreement void and unenforceable.

117.    At the time of the alleged exchange, the Lion Brothers faced severe economic duress directly caused by Nazi persecution, including:

    a. **Financial ruin**: The gallery recorded losses of 4,907 Reichsmarks in 1934 with zero profits, escalating to 10,605 Reichsmarks in losses by 1935;

    b. **Inability to pay salaries**: The brothers could not pay themselves or support their families due to the systematic destruction of their business;

c. **Forced closure of operations**: Their Berlin branch was forcibly closed in 1933 due to Nazi boycotts and persecution;

d. **Imminent business liquidation**: In August 1935, just months after the alleged "exchange," the Reich Chamber of Fine Arts ordered them to liquidate within four weeks.

118.    The Lion Brothers desperately needed cash income to survive, not additional artwork of inferior value. Any rational businessperson in their position would never have voluntarily exchanged a valuable Amerling painting for worthless works.

119.    The unconscionable disparity in value - acknowledged by Defendants' own Nazi-era director who boasted of acquiring an "excellent" painting while giving away "waste and trash" - demonstrates the absence of genuine consent.

120.    The alleged exchange occurred within a broader framework of state-sanctioned persecution orchestrated by Nazi governmental policy, creating a coercive environment that vitiated any possibility of free consent.

121.    Museum Director Ernst Buchner, a Nazi party member, was acting as a state official exercising governmental authority when he executed the coerced transaction 34.

122.    The transaction was formalized through "Ministerielle Entschließung Nr. 2715" (Ministerial Resolution No. 2715), demonstrating clear governmental authorization and state sanction.

123.    The Reich Chamber of Fine Arts order forcing liquidation of Jewish art dealers was direct governmental action that created the duress under which Defendants extracted this unconscionable "exchange."

124.    The Lion Brothers had no reasonable alternative but to accede to Defendants' demands, as:

a. Refusal would have meant complete financial ruin and inability to support their families;

b. The Nazi persecution campaign had systematically eliminated their ability to conduct normal business;

c. They faced imminent forced liquidation of all assets;

d. No legitimate market existed for fair transactions with Jewish dealers

125.    The alleged "exchange" violates fundamental principles of contract law requiring genuine assent free from coercion.

126.    Plaintiffs demands judgment declaring the 1935 transaction void due to duress and unconscionability, and awarding all relief requested in the Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter a judgment against Defendants Free State of Bavaria and the Bavarian State Painting Collections as follows:

a.    Ordering Defendants to immediately restitute and deliver the painting "Young Girl with Straw Hat" by Friedrich von Amerling (Inv. Nr. 9999) to Plaintiffs and the other heirs of Louis, Hans, and Fritz Lion;

b.    Issuing a declaratory judgment that the lawful heirs of Louis, Hans, and Fritz Lion are the sole and exclusive owners of the Painting and that Defendants have no valid legal right, title, or interest therein;

c.    Issuing a declaratory judgment that any coerced "exchange" made by the Louis, Hans, and Fritz Lion was made under duress, and that the exchange is declared null and void;

d.  In the alternative to restitution, awarding Plaintiffs compensatory damages in an amount to be determined at trial, equivalent to the full fair market value of the Painting;

e.  Awarding Plaintiffs pre-judgment and post-judgment interest at the maximum rate permitted by law;

f.  Awarding Plaintiffs all costs and reasonable attorneys' fees incurred in connection with this action; and

g.  Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims and issues so triable in this action.

Dated:  November 12, 2025
New York, New York

Respectfully submitted,

**JOHN J. MEEHAN, ESQ.**

John J. Meehan, Esq.
*Of Counsel* to Themis Law
Joseph & Norinsberg LLC.
*Attorneys for Plaintiff*
825 Third Avenue, Suite 2100
New York, New York 10022
Tel: (212) 227-5700
Fax: (212) 656-1889
jmeehan@employeejustice.com